UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:22-CR-213 (JBA) |
| vs. | : | |
| GIOVANNI DONOFRIO | : | August 21, 2023 |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Mr. Donofrio submits this memorandum in aid of sentencing, which is scheduled for September 1, 2023. He has pled guilty to one count of engaging in the business of manufacturing and dealing firearms without a license in violation of 18 U.S.C. §§ 922(a)(1)(A). This is his first arrest, and his first time ever appearing before a criminal court.

Mr. Donofrio has lived a life defined by hard work and devotion to his family. He has been on bond since his arrest on October 31, 2022, and save for a single instance of drug use early on, he has been compliant and productive during his period of release. He started working at a company installing generators, completed a training course to install generators on his own, and studied for and obtained a commercial driver's license ("CDL") learner's permit. He is now waiting for a date to take his final driving test to secure his CDL. Mr. Donofrio's misconduct is out of character, and he has demonstrated through his words and through his actions on pretrial release that he has learned from this experience. The offense for which he has pled guilty is undoubtedly serious, and as indicated in his letter to the Court (Exhibit A), his remorse is sincere and lasting. Mr. Donofrio respectfully submits that after accounting for his youth, his lack of criminal history, and his personal history and characteristics, a non-incarceration sentence with an extended period of home confinement is sufficient but not greater than necessary to achieve the goals of sentencing.

## **PERSONAL HISTORY AND CHARACTERISTICS**

Mr. Donofrio grew up in an immigrant family whose lives have been defined by hard work. His grandparents and parents emigrated from Italy, and although Mr. Donofrio was born in the United States, he returned to Italy with his family when he was four years old. By Mr. Donofrio's account, he grew up in a loving and supportive family. He lived in a multi-generational, bilingual home, and his grandparents were as much a part of his life as his parents and siblings. Mr. Donofrio's daily life has routinely involved doing things for others; whether he is picking items in the garden for his great-grandmother, helping neighbors do lawn work, or watching his nephews, he is devoted to family and to ensuring they are cared for. *See generally*, Letters of Support, Exhibit B.

Mr. Donofrio struggled in school, in large part due to his difficulty with writing English when he returned from Italy, and he ultimately decided not to finish high school. Yet, that decision was not borne out of laziness or because he was engaged in misconduct. On the contrary, Mr. Donofrio was committed to his family's business such that he opted for work instead of finishing school. Although his family was reluctant to let him leave after his sophomore year, they permitted him to do so given his expressed desire to maintain work in the service industry.

Mr. Donofrio recognizes now that it was a mistake to drop out of school. He lost the opportunity to secure a high school diploma, and he has since learned the necessity of a high school degree to be competitive for jobs. Although he has been able to find work and has been engaged in a CDL program, he acknowledges that finishing high school may have set him on a different trajectory, one that would have avoided any contact with the criminal justice system.

For example, he now recognizes that school may have provided a more constructive outlet for his interests and abilities. Mr. Donofrio's grandfather taught him about firearms at a young age.

Mr. Donofrio learned how clean firearms, disassemble and reassemble them, and maintain them, and he bonded with his grandfather through their shared experience of hunting. It became clear that Mr. Donofrio had a talent for putting together machinery, much like he had a talent for building structures out of Legos as a child.

Instead, Mr. Donofrio employed those talents improperly. As indicated by his letter to the Court, Mr. Donofrio readily acknowledges the danger he created by selling those assembled firearms to others. *See* Exhibit A. He is so fortunate that no one was injured, and the persistent thought of "what if" has left an indelible impression on Mr. Donofrio.

Since his arrest, he has tried to carve out a professional path for himself. Although initially he struggled following his arrest, he was able to obtain employment and enroll in school with the support and encouragement of his family. He obtained his CDL permit, and is waiting to take the final driver's test. He obtained a certificate as a certified generator installer in April 2023, and has started developing the skills required to do electrical work through his employment at Voltz. PSR at ¶ 52. Mr. Donofrio was recently laid off at Voltz due to work being slow, so he has turned his focus to attending the CDL program full-time to maximize his chances of passing his driving test. Once he has that license, he hopes that additional work opportunities will materialize.

**<u>A NON-INCARCERATION SENTENCE THAT ACCOUNTS FOR MR. DONOFRIO'S LACK OF CRIMINAL HISTORY, HIS YOUTH, AND HIS PERSONAL HISTORY AND CHARACTERISTICS IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO MEET THE GOALS OF SENTENCING</u>**

**I.     GUIDELINE CALCULATION**

The parties' plea agreement reflects that Mr. Donofrio's adjusted base offense level is 12. Since Mr. Donofrio has never been arrested or convicted before, he has zero criminal history points

3

and falls into Criminal History Category I.  After acceptance, a total offense level of 12 yields a guideline range of 10 to 16 months.

II. **THE COURT SHOULD VARY OR DEPART DOWNWARD TO ACCOUNT FOR MR. DONOFRIO'S COMPLETE LACK OF CRIMINAL HISTORY, HIS YOUTH, AND HIS PERSONAL HISTORY AND CHARACTERISTICS.**

The Sentencing Commission has stated that it "intends the sentencing court to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. Ch. 1, pt. A, subpt. 4(b).  Further, "the sentencing court may impose a sentence outside the range established by the applicable Guidelines, if the court finds 'that there exists…[a] mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described." U.S.S.G. § 5K2.0.

### A. Mr. Donofrio's Complete Lack of Criminal History.

Mr. Donofrio has zero criminal history points, placing him in Criminal History Category I. He has never been arrested or convicted of a criminal offense. Moreover, the impact of a federal criminal conviction, which Mr. Donofrio will carry with him for the rest of his life, cannot be overstated. Mr. Donofrio's complete lack of criminal history is relevant to determining the appropriate sentence in at least three ways: (1) in relation to the concept of incremental punishment, (2) because as a first-time offender, he is even more unlikely to recidivate than other offenders in Category I, and (3) because as a first-time offender, he will be severely punished by the collateral consequences of a felony conviction.

4

  *1.*  *The concept of incremental punishment.*

The fact that Mr. Donofrio has never spent even one day in prison before his arrest suggests that an incarceration sentence within (or even near) the Guidelines range would be disproportionate. In *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

Where an individual has never been incarcerated prior to this offense, as is the case here, a sentence within or even close to the Guidelines range would be excessively severe. That is because there is no reason to believe in such an instance that a prolonged period of incarceration would be more effective than a lesser sentence, because there is no point of comparison or historical example to disprove the efficacy of a lower sentence. See, e.g., *United States v. Bun*, 3:13cr174(SRU), Judgment (ECF No. #72) (citing *Mishoe* and stating that "[t]he sentence imposed represents an incremental increase that should be sufficient to serve the purposes of sentencing."); *United States v. Keels*, 3:15cr17(JCH) (imposing below-Guidelines sentence based in part on the concept of incrementally proportionate sentencing philosophy).

  *2.*  *Mr. Donofrio is less likely to recidivate than other offenders in Criminal History Category I because he is a first-time offender.*

The proposed amendments to the Sentencing Guidelines, which provides for a two-point reduction for defendants with zero criminal history points, recognizes that defendants who have

never had any interaction with the criminal justice system are less likely to recidivate.[1] This data encouraged the Sentencing Commission to propose a new amendment to the sentencing guidelines that allows for a two-point reduction in the base offense level where, subject to certain limitations, the defendant has zero criminal history points.[2]

Although Mr. Donofrio does not appear to qualify for the two-level deduction under the proposed U.S.S.G. § 4C1.1(a)(7) because the instant offense involved a firearm, the underlying purpose of the amendment remains an appropriate factor for the Court to consider. Mr. Donofrio is less likely to recidivate because this is his first encounter with the criminal court.

3. *Mr. Donofrio will be punished by virtue of the collateral consequences of his felony conviction.*

The Court should also consider that first offenders like Mr. Donofrio face a more severe penalty than other defendants, because in addition to the sentence, they experience for the first time the extremely serious collateral consequences of a felony conviction. A sentencing court should consider such collateral consequences before imposing a sentence. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). In *United States*

---

[1] *See U.S. Sentencing Comm'n, Recidivism of Federal Offenders Released in 2010* (2021), available at https://www.ussc.gov/research/researchreports/recidivism-federal-offenders-released-2010 (concluding that "zero-point offenders" had a lower recidivism rate than "one point" offenders [26.8% compared to 42.3%], "the largest variation of any comparison of offenders within the same Criminal History Category.").

[2] The PSR notes that Mr. Donofrio may be eligible for a two-level downward departure because he has zero criminal history points. *See* PSR at ¶ 78. Although Mr. Donofrio submits that his lack of criminal history points highlights his low risk of recidivism and that he is an appropriate candidate for a non-incarceration sentence, he acknowledges that the new proposed two-point reduction does not appear to apply where, as here, the defendant sold a firearm in connection with the offense. *See* Proposed Amendments to U.S.S.G. § 4C1.1(a)(7).

*v. Nesbeth*, *supra,* Senior District Judge Block in the Eastern District of New York departed substantially below the Guidelines range in the case of a woman convicted of importing 602 grams of cocaine. He noted that because this was her first felony conviction, it would bring with it a number of collateral consequences, the effect of which would be "devastating." *Id.* at 180. Judge Block added "As Professor Michelle Alexander has explained, myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civil death' and send the unequivocal message that 'they' are no longer part of 'us.'" *Id.* (noting over 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons.")

Mr. Donofrio's life has been largely defined by work. He secured his first job at age 13 (see PSR at ¶ 39) and he has worked consistently throughout his young life. As a young man without a high school diploma, he already faced challenges in finding jobs. Now, he must build a professional life with a felony conviction. He knows that his future options are seriously limited. As one court once noted, the stigma associated with a conviction and being known as a criminal by family, friends and society is "no small punishment" for one renown for his high moral standards and character. *See United States v. Myers*, 353 F.Supp.2d 1026, 1031 (S.D. Iowa 2005).

**III.   MR. DONOFRIO'S YOUTH IS AN APPROPRIATE FACTOR FOR THIS COURT TO CONSIDER WHEN DETERMINING HIS SENTENCE.**

Although the United Sentencing Guidelines once provided that age is not an appropriate consideration in fashioning a sentence, those guidelines were amended in 2010 to provide that "[a]ge (including youth) may be relevant in determining whether a departure is warranted…". U.S.S.G. § 5H1.1. The Commission made the adjustment "after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and

7

feedback in various forms from federal judges."[3]  For years, developments in neuroscience and behavioral psychology have demonstrated that young people are less culpable than their older peers whose brains and character traits are more fully evolved.  Neuroscientific studies reveal "the areas of the brain that govern impulse control, planning, and foresight of consequences mature slowly over the course of adolescence and into early adulthood, while the arousal of the limbic system around puberty increases sensation seeking in early adolescence."[4]  As a result of these findings, it is well established that "adolescents are more impulsive, risk-seeking, subject to peer influence, and inclined to focus on immediate consequences of their choices than are adults."[5]  More recently, the Sentencing Project, in its public comment to the proposed guideline amendments, noted that "[e]merging adults [25 years and younger] share many of the same qualities as teenagers below 18,"

---

[3] *Youthful Offenders in the Federal System*, U.S.S.G. (May 2017) at p. 4, 5-7 (discussing 2010 amendment and summarizing pertinent Supreme Court case law on the subject) (located at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf (last accessed Aug. 21, 2023)).

[4] *See* Elizabeth S. Scott, "Children are Different": Constitutional Values and Justice Policy, 11 Ohio St. J. Crim. L. 71, 87 (2013); Laurence Steinberg, Adolescent Brain Science and Juvenile Justice Policymaking, 23 Psychol. Pub. Pol'y & L. 410, 414–15 (2017) (describing brain imaging studies evidencing immaturity in the young person's brain regions critical to executive function and heightened responsiveness in the socioemotional incentive-processing system, which taxes the capacities for self-regulation); see also *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[P]arts of the brain involved in behavior control continue to mature through late adolescence.").

[5] Scott, *supra* at 87; *see also* Steinberg, *supra*, at 413–14 (discussing behavioral studies revealing that compared to adults, youth are more impulsive, more likely to engage in sensation-seeking, more likely to succumb to peer pressure, and more likely to consider immediate gratification than the future consequences of their actions); Elizabeth Cauffman et al., *How Developmental Science Influences Juvenile Justice Reform*, 8 UC Irvine L. Rev. 21, 28–29 (2018) (same); *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (recognizing three behavioral "gaps" between adolescents and adults that illustrate the reduced culpability of adolescents who commit crime)

and as a result, the same sentencing principles that consider youths' "diminished culpability and great potential for growth" should apply.[6]

Mr. Donofrio was 21 years old at the time of the offense. While his youth does not absolve him of his misconduct, it is an appropriate factor for the Court to consider in determining his sentence. The failure to think through the potential consequences of his misconduct, both to himself and to the safety of the community, is a clear example of delayed maturation of those "areas of the brain that govern impulse control, planning, and foresight of consequences."

## IV. THE FACTORS UNDER 3553(A) SUPPORT A NON-INCARCERATION SENTENCE.

### A. Mr. Donofrio's Personal History and Characteristics and the Nature of the Offense

It is indisputable that this offense is serious. Mr. Donofrio sold firearms to individuals who wrongly used those weapons. He acted thoughtlessly when he indirectly put dangerous firearms on the street, and he is very fortunate that no physical harm came to anyone. The information he has learned through the pendency of this case, and the prospect of incarceration for his actions, has given him the resolve to completely walk away from firearms and the people with whom he had dealings.

By all accounts, the misconduct that brings him before this Court is entirely out of character for Mr. Donofrio. In the letters of support, his family describe him as a hard worker, a devoted family member, and a person who routinely takes care of others. His former employer describes him as courteous and respectful. He devotes considerable time to his family, and does whatever is

---

[6] *See* United States Sentencing Commission Public Comment on Proposed Priorities by the Sentencing Project at 190 (located at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202308/88FR39907_public-comment_R.pdf#page=64, last accessed Aug. 21, 2023).

9

asked of him. Recently, he has been helping his family manage his beloved grandfather's illness and hospitalization. It is not an easy time for his family, but it has made it ever more apparent how fortunate he is to have them.

Mr. Donofrio has also worked hard to straighten out his path. After an initial slump following his arrest, he found a job and looked for opportunities for growth. He remains intrigued at the possibility of enrolling in electrical school, and he has done the research to figure out that if he can obtain a CDL and secure the requisite experience, he could be very successful as an electrician. His efforts during the period of pretrial release confirm that he is on a positive trajectory toward a productive and stable life.

### B. A Non-Incarceration Sentence Will Satisfy the Court's Need to Reflect the Seriousness of the Offense and to Provide Just Punishment.

A sentence of home confinement not only adequately addresses deterrence, but also it constitutes just punishment. The concept of "just punishment" under §3553(a)(2)(A) refers to the need for a defendant's punishment to fit the crime. In the Senate Report accompanying the Sentencing Reform Act, the Act's sponsors explained:

> [Just punishment]—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

S. Rep. 98–225, 1984 U.S.C.C.A.N. 3182, 3258–59.

Mr. Donofrio will be punished by a period of home confinement, but that period also serves the other purposes of sentencing, namely his vocational needs. Up until recently, Mr. Donofrio has

10

been managing full-time employment at Voltz with his training for his CDL.  Once he was laid off from Voltz, he devoted his full attention to school in order to maximize his chances of passing his CDL driving test.  He is actively exploring opportunities for work once he obtains the CDL, and hopes to have something lined up shortly after his test.  He is also committed to securing his high school degree.  At Mr. Donofrio's age, his ability to secure and maintain education and steady employment will be fundamental to his success.  A period of incarceration could derail his path forward.

### C. The Sentence Proposed Will Afford Adequate Deterrence and Protect the Public from Future Crimes by Mr. Donofrio.

There is no doubt that specific deterrence should not be a concern for this Court.  Mr. Donofrio has acknowledged his responsibility and the seriousness of his misconduct.  Although perhaps too simple an explanation, he notes that he did not think through the potentially devastating consequences of his misconduct.  He was focused on himself, and his own financial gain, without more.  The events that stemmed from his selling of firearms, which he learned of after the fact, has changed him.  Although Mr. Donofrio grew up with a comfort and understanding of firearms because they were part of his family's hunting traditions, he now sees them in a different light.  The possibility that someone could have been gravely injured weighs heavily on him.  Furthermore, he disappointed his family.  As one supporter noted, "[h]aving been a police officer, I am aware of the shame and hardship that a case like this brings to a family.  I believe that Giovanni is remorseful and regrets his actions shedding a bad light on his family's name and reputation."  *See* Exhibit B-6.  Here, the mere fact of the arrest has effectively deterred Mr. Donofrio from any future misconduct.

As for general deterrence, it is not clear that the severity of a sentence (as opposed to the certainty of the imposition of some sentence) has any significant general deterrent value. The fact of

the conviction, and the public nature of the arrest, plea and sentence, will also impact general deterrence. Mr. Donofrio does not need to serve a period of incarceration, at the expense of his educational and vocational goals, and his invaluable service to this family, for the community to appreciate, and heed, the devastating impact that this felony conviction will have on Mr. Donofrio's life.

## CONCLUSION

In his presentence interview, Mr. Donofrio described himself as a "hard worker" and "helpful," words that comport with the descriptions offered by family and friends. *See* PSR at ¶ 48. Mr. Donofrio has lived a life largely defined by his work ethic, his devotion to his family, and his respectful treatment of others. Undoubtedly, Mr. Donofrio had a serious lapse of judgment when he decided to sell firearms without a license, but the life he has lived demonstrates he is more than his offense. Mr. Donofrio is a young man who must bear the stigma of a federal felony conviction for the remainder of his life. He intends to use the years ahead of him productively and wisely, and to strike a path that ensures he never returns to this Court.

Respectfully submitted,

THE DEFENDANT,
Giovanni Donofrio

Dated: August 21, 2023

/s/ Allison M. Near
Allison M. Near, Esq. (ct27241)
Jacobs & Dow, LLC
350 Orange Street
New Haven, CT 06511
Tel. (203) 772-3100
Fax. (203) 772-1691
Email: anear@jacobslaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 21, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Allison M. Near
Allison M. Near